538 F.2d 991
 Cynthia Jo SAMUEL et al., Plaintiffs-Appellants in No.
75-1965 in D.C.
Patricia Farley et al., Intervening Plaintiffs in D.C.
v.
UNIVERSITY OF PITTSBURGH et al., Appellants in No. 75-1966.
Appeal of TEMPLE UNIVERSITY et al., in No. 75-1967.
Appeal of the PENNSYLVANIA STATE UNIVERSITY et al., in No. 75-1968.
 Nos. 75-1965 to 75-1968.
 United States Court of Appeals,
Third Circuit.
 Argued April 9, 1976.
Decided June 29, 1976.
 
 Michael P. Malakoff, Berger & Kapetan, Pittsburgh, Pa., for appellants.
 James M. Arensberg, Tucker Arensberg & Ferguson, Pittsburgh, Pa., for appellees-cross-appellants, University of Pittsburgh, et al.
 Delbert J. McQuaide, McQuaide, Blasko & Brown, Inc., State College, Pa., for appellees-cross-appellants, Pennsylvania State University.
 Richard Z. Freemann, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for appellees-cross-appellants, Temple University, et al.
 Robert P. Meehan, Deputy Counsel, Dept. of the Auditor Gen., Harrisburg, Pa., for appellees, Milton J. Shapp, et al. and Robert P. Casey.
 Before CLARK,* Associate Justice, and GIBBONS and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 Mr. Justice CLARK:
 
 
 1
 Appellants, Samuel and Meyers, filed this class action against the appellees, the University of Pittsburgh, Temple University and Pennsylvania State University (Universities), the Governor, Attorney General, and Auditor General of Pennsylvania under 28 U.S.C. § 1343(3) and (4) and 42 U.S.C. § 1983, and thereafter Lambert and Farley intervened therein. Appellants attack a statewide residency rule B(2) and its successors,[1] applied by Universities, which provide that for tuition purposes the domicile of the wife is that of the husband. Appellants claim that the rule deprives them of their right to equal protection of the laws under the Fourteenth Amendment by requiring them to pay higher tuition fees than other Pennsylvania residents. On August 21, 1972, the District Court certified the case as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure, finding the class to include those married women students attending any of the Universities who were Pennsylvania residents but who were denied that status due to the application of Rule B(2) and its successors. Samuel v. University of Pittsburgh, 56 F.R.D. 435 (W.D.Pa.1972). The Court on May 29, 1974, ordered the Universities to deduct 10 percent of each amount paid in restitution to the class to be applied to the payment of attorneys fees and costs.
 
 
 2
 On April 10, 1974, after extensive discovery and a four-day trial, the District Court concluded that Rule B(2) and its successors were unconstitutional, permanently enjoined their application, and ruled that the class members who had suffered injury thereby were entitled to restitution. Samuel v. University of Pittsburgh, 375 F.Supp. 1119 (W.D.Pa.1974). However, the Court decertified the class as to restitution, finding that each of its members "will present an entirely different factual basis for her contention that she is due restitution", and that no common question of fact or law remained. 375 F.Supp. 1136. The members of the class thus were left to pursue their individual claims; the court suggested that the claims be processed through administrative channels established by the Universities.
 
 
 3
 At a conference on April 9, 1974, the District Court denied appellants' motion for the appointment of a master to determine the amount due each student, and to rescind its order decertifying the class as to restitution. It directed on June 7, however, the Universities to bear the expense of identifying members of the class and notifying them that, although the Universities had been found liable to the class, their damage claims would not be adjudicated on a class basis.
 
 
 4
 On June 13, 1974, the appellants filed a motion to stay the Court's June 7th order until such time as this court could review the District Court's class decertification order. Appellants simultaneously filed an appeal to this court. On the District Court's denial of a motion for stay, one was issued here. On December 26, 1974, this court held that it lacked jurisdiction over plaintiffs' appeal and vacated its July 10, 1974 stay order. Samuel v. University of Pittsburgh, 506 F.2d 355 (3d Cir. 1974).
 
 
 5
 On February 13, 1975, after an evidentiary hearing, the District Court found that appellants, Samuel, Meyers, Farley, and Lambert, were not entitled to restitution on the facts of their cases. The Court, on June 6, 1975, denied a claim for $188,000 in attorneys' fees (in addition to the contingent fee of 10 percent previously ordered by the Court). 395 F.Supp. 1275 (W.D.Pa.1975). This appeal was taken from these rulings. The Universities filed their cross-appeals as to their liability for restitution.
 
 
 6
 The only questions on appeal concern the decertification of the class, restitution due the named members thereof, attorneys fees and costs, and the cross-appeal on the liability of the Universities for restitution.
 
 
 7
 We have concluded that the District Court correctly held that restitution is due any women who paid the higher out-of-state tuition rate solely by reason of the application of the unconstitutional residency rules. However, we reverse the order decertifying the class as to restitution as well as the order denying recovery to the appellants, Meyers, Lambert, Samuel, and Farley. The order creating a common fund from a 10% assessment against individual restitution recoveries is vacated to the extent it provided for award of attorneys' fees and reversed to the extent that it provided for award of costs. The order denying plaintiffs' counsel's petition for award of attorneys' fees is also vacated, and the case is remanded for further consideration in light of this opinion.
 
 The Liability of the Universities
 
 8
 In addition to the injunctive relief, appellants also sought reimbursement for the difference between the lesser in-state and the higher out-of-state tuition which they were forced to pay by reason of the discriminatory residency rules. As the District Court held;
 
 
 9
 The equitable remedy of restitution is part and parcel of the injunctive relief already granted plaintiffs. Having assumed jurisdiction in equity over plaintiffs' claim for injunctive relief, the Court may pass upon the intertwined question of restitution as it sees fit. 375 F.Supp. at 1135 (citations omitted).
 
 
 10
 The Court found that the Universities were unjustly enriched in that they wrongfully secured a benefit which it would be unconscionable for them to retain. We agree with this conclusion. Moreover, there was justifiable reliance by the class upon the representation of the Universities, backed by the Auditor General and the Attorney General of Pennsylvania that the out-of-state fee was correct and was due and payable before they could be registered. In the face of such a galaxy of authority, it could hardly be expected that a student applicant would rebel.
 
 
 11
 The Universities, having obtained the excess fees from the class under the pretext that the exaction was legal, now interpose "a good faith" defense. But on the record such a claim is pure sophistry. It shows that at the very time the fees were being exacted, Rule B(2) was openly questioned,[2] and was amended twice but nonetheless continued to be enforced as if it was in its initial language. Even after Rule B(2) was declared illegal by the same state officer whose stamp of approval it bore all during the period of exactions from appellants, its application continued to be as originally written.[3]
 
 
 12
 Despite these facts, the Universities contend that their retention of the illegally exacted fees would not offend equity and good conscience. However, the District Court held that under the facts here, the retention of such illegally exacted fees would be unconscionable. There is credible evidence supporting such a finding, and we cannot say that it is clearly erroneous. The Universities also argue that the class received an education which cost them much more than the non-resident tuition charged; that restitution would result in an unfair increase in the tuition paid by present students as well as those hereafter enrolling in the Universities; and, finally, that the class here was late in pressing its claims. We find no merit in any of these contentions. The actual cost of the education appellants received is of no consequence here. The crucial point is that the Universities overcharged members of the class, requiring them to pay a higher fee than other residents of Pennsylvania. Nor can restitution be avoided because it may ultimately require higher fees. As the District Court pointed out, the Universities may include the restitution cost in their state budget appropriation. After all, the money exacted from the class was used to defray general expenses of the Universities, not the specific cost attributable to the education of the members of the class. Nor was the class late in pressing its claims under either statutory or equitable principles.
 
 
 13
 The Decertification of the Class for the Purpose of Restitution
 
 
 14
 The District Court held that the prerequisite to a class action under Rule 23(a)(2), the existence of questions of law or fact common to the class, is not met as to the issue of restitution. But, as the Court itself noted, this may be "a truism . . . inherent in almost every class action brought under Rule 23." 375 F.Supp. at 1136-1137. Despite this acknowledgment, the lower court decertified the class as to restitution because "every class member will present an entirely different factual basis for her contention that she is due restitution." Id. at 1136.
 
 
 15
 In almost every class action, factual determinations like these pertaining to individual class members must be made. See, e. g., United States v. United States Steel Corp., 520 F.2d 1043 (5th Cir. 1975); E. E. O. C. v. Detroit Edison Co., 515 F.2d 301, 315 (6th Cir. 1975); Meadows v. Ford Motor Co., 510 F.2d 939, 942 (6th Cir. 1975). Still we know of no case where this has prevented a court from aiding the class to obtain its just restitution.[4] Indeed, to decertify a class on the issue of damages or restitution may well be effectively to sound the death-knell of the class action device. Attorneys will certainly hesitate to bring class actions knowing that after investing time and effort in establishing a violation they may be deprived of an award of counsel fees when the court by decertifying on damages prevents the creation of a benefit fund from which an award can be made. While we recognize that we cannot substitute our judgment for that of the District Court on the issue of manageability of the class for purposes of restitution because of the discretion afforded by Rule 23, Fed.R.Civ.P., we are convinced that an informed discretion was not exercised in this case.[5]
 
 
 16
 As we see it, there are only two questions remaining to be answered: first, whether the student was, in fact, a Pennsylvania resident at the time she paid tuition at the non-resident rate; and, if so, the amount of restitution which she is due. The first question can be easily determined by the application of the standard laid down by the District Court to the objective data contained on the admission data card of each student. The second question can be quickly determined by measuring the difference between the then established lesser in-state rate with that of the higher out-of-state one which was exacted from each member of the class. Thus, we fail to see any support for the District Court's conclusion that the class is unmanageable on the restitution issue. Moreover, even if there were managerial difficulties, some investigation into the possible usefulness of subclasses as suggested by Rule 23(c)(4)(B) should have been undertaken before decertification was ordered.
 
 
 17
 The District Court also abused its discretion by explicitly considering an irrelevant factor in its decision to decertify the class. In discussing the restitution issue, the Court found "the general financial outlook of each" of the Universities "less than rosy", and then added:
 
 
 18
 It is believed, in light of the termination of the plaintiff class discussed in the next section, that the financial burden incurred by defendant universities will be strictly limited to what is fair and just under the circumstances. 375 F.Supp. at 1136.
 
 
 19
 It cited no cases justifying this decertification, and apparently there are none since the Universities, rather than citing authorities, deal only in attribution. The District Court with complete frankness, five lines prior to the above quotation, stated categorically that the question "of financial hardship . . . has been earnestly considered." Still Pennsylvania State and other related Universities say that:
 
 
 20
 the District Court did not terminate the class because of the financial burdens of the universities. Rather, it merely indicated that restitution would be "strictly limited to what is fair and just" because individual class members would be required to present their cases individually. Brief for Appellee, Pennsylvania State University, at 1 (citations omitted).
 
 
 21
 To us the language is very clear and such an interpretation is a far cry from what the language even connotes. It appears to us that by decertifying and thus requiring each student to fend for herself in recouping her money, the District Court has effectively precluded most of the students from recovering the funds that the Universities illegally exacted from them. The experience of appellee, Temple University, demonstrates the problem. It sent out notices in 1972 to 2583 students, of which 564 (almost 22%) opted out of this suit immediately; thereafter in 1974 it sent out second notices to 600 students who had not previously opted out. Despite these notices and others mailed out by the Universities, only two students have intervened in this case. Indeed, the Attorney General says flatly in his brief "that only a handful of women were interested in asserting claims for restitution", despite the fact that it was estimated in 1974 and undenied that a total of "a couple of million dollars" was illegally exacted by the Universities from their students. The reason for this lethargy is obvious the time, trouble, and expense involved for each member of the class in the processing of her individual claim. Indeed we conclude that those members of the class whose claim is small will not be able to secure the necessary assistance of counsel unless the decertification is lifted. As a result, the decertification of the class will result in a windfall of thousands of dollars to the Universities which rightfully belongs to the students. This we cannot permit since common honesty dictates that the claim is not only just but is in good conscience due and payable.
 
 
 22
 We therefore hold that the District Court abused its discretion in concluding that the absence of questions of law or fact common to the class required decertification, and direct the Court to recertify the plaintiff class.
 
 Restitution Due Appellants
 
 23
 In passing on these claims, the District Court applied five primary factors or indices to determine the residence of the claimants: 12 months' residence in Pennsylvania as a non-student prior to enrollment; the state where registered to vote; the state where licensed to drive a car; the state where previously employed, if any; and, residence at the time of application and enrollment. This objective data is contained on the admission data card of each student, and almost without exception, it was the only information considered by the Universities when they determined the residency of all students including those members of the class. Indeed, the record indicates that it was the policy of the Universities that students not be examined orally about their subjective intent as to residency, since that decision was made by a residency clerk on the basis of information contained on the admission data card. In applying to the appellants, these five factors used by the District Court, we conclude that the denial of each of the claims was clearly erroneous and that they should be allowed.
 
 
 24
 Cynthia Lambert applied to the University of Pittsburgh in August, 1973, but was denied in-state status; she appealed and in March, 1974, the Auditor General ruled that she was entitled to attend the University as a Pennsylvania resident. The school authorities, however, exacted a fine of $25 in March for late registration caused by the contest over her status. Restitution in the amount of this fine was denied on the grounds that the matter was not properly before the Court. We disagree. The District Court, sitting in equity, was empowered to grant whatever relief was necessary to make appellants whole for any loss resulting from the Universities' illegal acts. We believe that Lambert is entitled to the $25 refund since the refusal of the University to classify her as being a resident triggered the late registration.
 
 
 25
 Patricia Farley came to Pennsylvania on September 1, 1972. Beginning in November of that year until the date of this appeal, she has been employed at Magee Women's Hospital in Pittsburgh. In October, 1972, she registered to vote in Pennsylvania. She registered her automobile there in February, 1973, although she does not have a Pennsylvania driver's license. In July, 1973, she applied for a course at the University of Pittsburgh and was classified as a non-resident. She was enrolled at the University in September, 1973, but was forced to drop out in December because she could not afford the out-of-state tuition. Farley registered again in June, 1974, but has not yet been classified as an in- or out-of-state resident. The District Court found that she was not a Pennsylvania resident during the fall term of 1973 because she had not resided in the state for 12 months at the time of her application for enrollment in July. We conclude from the record that the Universities calculated the length of residence from the time of actual enrollment at the University, not from the time of application for enrollment.[6] Farley had been a resident of Pennsylvania for exactly 12 months when she enrolled at the University in September, 1973. We hold that she was a Pennsylvania resident at that time and that she is entitled to restitution for any overpayments of tuition made subsequently.
 
 
 26
 Dena Meyers came to Pennsylvania in 1963 to attend the University of Pittsburgh. She did so on both an undergraduate and graduate level until April, 1970, paying tuition as a non-resident. She worked for the Pittsburgh Board of Education as a substitute teacher, and at the Braddock School System and Eye and Ear Hospital from April, 1970, until June, 1971. In June, Meyers re-entered the University. She was forced to pay tuition as a non-resident for the summer and fall terms but not for the winter term. Since September, 1971, Meyers has been teaching at the Frick Elementary School. She has been registered to vote in Pennsylvania since the spring of 1971. Although she does not have a Pennsylvania driver's license, her car is registered in Pennsylvania. On the basis of this evidence, we conclude that Meyers should have been permitted to pay in-state tuition rates during the summer and fall terms of 1971, and that the trial court erred in finding otherwise. We hold that she is entitled to a refund for any excess tuition fees exacted from her during this period.
 
 
 27
 Cynthia Jo Samuel attended college in New York, and subsequently taught school in New Jersey. She left New Jersey in April, 1970, for Pittsburgh where her husband was to attend medical school. In June, 1971, she enrolled at the University of Pittsburgh. From April, 1970, to June, 1972, she held a series of jobs in Pittsburgh. Samuel had her automobile registered in Pennsylvania and obtained a driver's license there prior to June, 1970. She registered to vote in Pennsylvania in August, 1970. It is true that after separating from her husband, she returned to New Jersey in July, 1972, and remained in New Jersey after a reconciliation with him at a later date. However, we believe that at the time of her enrollment, June, 1971, she met the criteria laid down by the District Court for residence in Pennsylvania and should not be penalized because of the unfortunate separation from her husband in July, 1972.
 
 The Attorneys' Fees and Costs
 
 28
 In an effort to create a common fund out of which attorneys' fees could be awarded, the District Court, following decertification of the class for purposes of restitution, ordered the Universities to withhold ten percent from each sum recovered by individual plaintiffs.[7] However, as noted previously, no student who had sought restitution was found eligible either by the court or by the defendant Universities. Since there was no common fund from which attorneys' fees could be awarded on a common benefit theory, the District Court denied appellants' counsel's petition.[8] Since we are reversing the District Court on the issue of class decertification, we also vacate the orders creating the common fund and denying appellants' counsel's petition for award of attorneys' fees. Any award of attorneys' fees should be made out of the class' recovery according to the standards established by this Circuit in Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973).
 
 
 29
 We hold that the District Court abused its discretion in ordering that appellants' costs be covered by the common fund composed of 10 percent of their recovery. The effect of this order was to force appellants to cover their own costs in bringing this litigation even though they prevailed against appellee state officials and Universities on the dominant issue of the constitutionality of the residence rules and secured an injunction against them. The law is clear that a district court may not deny costs to the prevailing party unless it supports that determination with an explanation. ADM Corp. v. Speedmaster Packaging Corp., 525 F.2d 662, 664-665 (3d Cir. 1975). This the District Court did not do and therefore we direct the Court on remand to enter an order awarding costs to appellants. We hold that the appellee state officials are liable along with the Universities for these costs and that the Eleventh Amendment does not bar an award of costs against them. Fairmont Creamery Co. v. Minn., 275 U.S. 70, 48 S.Ct. 97, 72 L.Ed. 168 (1927); Boston Chapter N. A. A. C. P., Inc. v. Beecher, 504 F.2d 1017, 1029 (1st Cir. 1974), cert. denied, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); Class v. Norton, 505 F.2d 123, 126-27 (2d Cir. 1973).
 
 Action on Remand
 
 30
 On remand an order recertifying the class as to restitution should be entered as well as appropriate judgment for appellants, Meyers, Lambert, Farley, and Samuel.
 
 
 31
 We applaud the effort of the District Court to keep the cost of this suit to a minimum. We believe that this effort would be further served if the Clerk of the District Court were directed to send notice to each member of the class informing her of our decision, and enclosing a copy of this opinion. Such a notice with appropriate enclosures might be prepared jointly by the Clerk, the Universities and counsel for the parties. Members should be advised that the refund to which they are entitled will be the difference between the amount of tuition paid at the non-resident rate and the in-state rate less a proportional deduction, to be determined later, for the award of attorneys' fees. If practical, an estimate of this figure should be stated in the notice.
 
 
 32
 The Court should direct the Universities to conduct a preliminary review of the registration cards of class members to determine their residency status according to the same criteria employed with respect to single women and males during the period at issue. The Universities should also be directed to compute the amount of individual recoveries of those found eligible for in-state tuition rates. Only the registration cards of class members found by the Universities to be ineligible for in-state tuition rates should be forwarded to the Clerk of the Court for verification. The Universities should also forward the results of of their preliminary residency investigation and computations directly to the Clerk who will notify all class members of the outcome of their particular claims. Any controversy between the parties regarding the residency status or amount of individual recovery of class members might be referred to a magistrate for initial decision.
 
 
 33
 It is So Ordered.
 
 
 
 *
 The Hon Tom C. Clark, Associate Justice (Retired), Sitting by designation
 
 
 [1]
 Rule B(2) as promulgated by the Office of the Auditor General of Pennsylvania on June 7, 1967, provided:
 The domicile of a wife (adult or minor) is that of her husband. Where, however, an unmarried woman enrolled as a student having a Pennsylvania resident status marries a non-Pennsylvania resident, she shall continue to be classified as a Pennsylvania resident within the meaning of these Rules.
 This Rule was effective until February 11, 1972, when the Attorney General of Pennsylvania withdrew his approval of the legality of the rule. On July 14, 1972, the office of the Attorney General informed each defendant university that "a married woman's residency is prima facie the same as her husband's", but that "(i)f convincing evidence is presented, it may be established that a married woman is a Pennsylvania resident in spite of the fact that her husband is not". From that time until April 6, 1973, the Universities claim that the standard promulgated by the Attorney General did not change its classification practices from that employed when Rule B(2) was in effect. On April 6, 1973, Rule A(3) was promulgated. It provided: "A married woman is presumed to have the domicile of her husband; however, such presumption may be rebutted by convincing evidence to the contrary." Rule a(3), was applied by the same administrative processes employed by the Universities in the administration of both former Rule B(2) and the intervening standard promulgated by the Attorney General.
 
 
 [2]
 The record shows, and it has not been denied, that as early as June, 1971, the chancellor of one of the Universities recognized that Rule B(2) was illegal. Furthermore, in August of 1971, and again in March 1973, the Director of the Pennsylvania Human Relations Commission, Homer Floyd, warned the Auditor General, Robert Casey, that he was acting illegally
 
 
 [3]
 See note 1, supra
 
 
 [4]
 However, we recognize that there may be circumstances where the Court could properly decertify a class. See, e. g., Katz v. Carte Blanche Corp., 496 F.2d 747 (3d Cir.) (en banc), cert. denied, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974); Nix v. Grand Lodge of Int'l Ass'n of Machinists and Aerospace Workers, 479 F.2d 382 (5th Cir. 1973), cert. denied, 414 U.S. 1024, 94 S.Ct. 449, 38 L.Ed.2d 316 (1973)
 
 
 [5]
 An order of a district court decertifying a class may be reversed only for an abuse of discretion. See, e. g., Paton v. La Prade, 524 F.2d 862, 875 (3d Cir. 1975); Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 245 (3d Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975)
 
 
 [6]
 The residency clerk at the University of Pittsburgh from 1966 until the present, Donna Santillo Goldberg, testified on July 1, 1974:
 Q: Is it important that the person worked in the state that 12 months or just live in the state?
 A: The regulations state that he has to be living in the state.
 Q: And when you look at the 12-month period, do you look at the time they came into the state until they actually enrolled at the school?
 A: Yes.
 Q: And that would be opposed to coming to the state and the time they applied to the school?
 A: Yes.
 Q: It is when they come into the state until the time they are actually going to enroll in school?
 A: If we have the information when they are going to be enrolling.
 Moreover, the assistant registrar at the University of Pittsburgh from 1968-72, Frederick A. Sehring, testified at his deposition:
 We would use from the time he . . . began to reside in the Commonwealth . . . until the time he actually enrolled, September, January or April. (Emphasis added).
 
 
 [7]
 App. at 120A
 
 
 [8]
 Samuel v. University of Pittsburgh, 395 F.Supp. 2175 (W.D.Pa.1975). The Court also considered and rejected the private attorney general and bad faith theories justifying award of attorneys' fees