**Phyllis S. STONES, Plaintiff,**

v.

**LOS ANGELES COMMUNITY COLLEGE DISTRICT, et al., Defendants.**

**No. CV 82–5995–ER(Px).**

United States District Court, C.D. California.

Sept. 28, 1983.

Bruce M. Stark, Long Beach, Cal., for plaintiff.

Office of General Counsel, Los Angeles Community College Dist., Mary L. Dowell, Los Angeles, Cal., for defendants.

## MEMORANDUM DECISION

RAFEEDIE, District Judge.

This matter was tried to the court sitting without a jury commencing July 13, 1983. Bruce M. Stark appeared for plaintiff Phyllis Stones, and Mary L. Dowell, Office of General Counsel, Los Angeles Community College District, appeared for the defendants. Having fully considered the evidence presented, and the arguments of counsel, the Court hereby renders its decision as follows.

### I

This is an action for injunctive and compensatory relief brought by Phyllis Stones against the Los Angeles Community College District (the "District"), Leslie Koltai and Mary E. Lee pursuant to 42 U.S.C. § 1981 and § 1983. Plaintiff is a black woman, currently employed by the District as an Assistant Dean of Instruction. Plaintiff was first employed by the District when it was part of the Los Angeles Unified School District in 1962. She has served as a teacher, a college instructor, a Department Chair, an Administrative Intern, a Coordinator of Community Services, and an Assistant Dean of Instruction. She has been an Assistant Dean of Instruction at Los Angeles Valley College since 1978.

Since 1978, and at all times relevant to this action, each college in the District has had three deans. The deans constitute the second highest administrative level at a college, and report directly to the college president. In about 1978, plaintiff applied for the position of Dean. It was determined she met the minimum qualifications for the position, and she since then has been part of the "Dean's pool," a list of approximately 180 persons who meet the minimum qualifications to be a Dean, and who are all considered for each opening for Dean as openings occur. Whenever an opening for a dean has occurred, and has been filled from the pool (rather than by administrative transfer of another permanent Dean), plaintiff's application and references have been reviewed.

When a vacancy occurs for the position of Dean, the selection process leading to a permanent replacement begins with the appointment by the College President of a search committee. Typically, the search committee for an appointment at the Dean's level is composed of the President himself or herself, members of the faculty, members of the administration at the college who will interact often with the Dean and possibly a student. The search committee reviews all applications in the Deans' pool from applicants interested in the particular deanship and particular college, and the references submitted on confidential "tracers" solicited from each candidate's supervisors or references, in order to determine which candidates to invite for an interview. However, the District's procedure permit this initial review to be performed by the college president himself or herself, or by one or more designees. This is done on occasion.

After reviewing the applications, the college president and/or committee invite for interview, those candidates who appear to be the most outstanding available, taking into consideration such factors as the particular needs of the college, the particular area of administration involved (e.g. instruction, administrative services or student services), and the District's commitment to affirmative action. The interview committee sees the candidates invited, and then recommends two candidates to the Chancellor and the Board of Trustees. The Chancellor reviews the qualifications of the two candidates recommended, and may consult the college president. The Chancellor may recommend one candidate to the Board of Trustees, or may recommend both candidates as equally suited for the position. The Board of Trustees may accept or reject the Chancellor's recommendation. The

Board of Trustees makes the final decision regarding appointment of a Dean.

Plaintiff's application for a position as Dean was reviewed in conjunction with the hiring process conducted by the District for each of the four positions for Dean of Instruction that became available in 1979, 1980, and 1982. The persons who were invited to interview for the position at East Los Angeles College were deemed by the selection committee to be better qualified than plaintiff, and the person selected, Noel Korn, was deemed by the interview committee to be better qualified. The persons who were invited to interview for the position at Los Angeles Mission College were deemed by the selection committee to be better qualified than plaintiff, and the person selected, Raul Cardozo (who is Hispanic), was deemed by the interview committee to be better qualified. The persons who were invited to interview for the position at Los Angeles Valley College were deemed by the selection committee to be better qualified than plaintiff, and the person selected, Dr. Edwin Young, was deemed by the interview committee to be better qualified. The people who were invited to interview for the position at Los Angeles Pierce College were deemed by the selection committee to be better qualified than plaintiff, and the person selected, Jean Loucks (who is a woman), was deemed by the interview committee to be better qualified.

Plaintiff contends that her failure to attain the position of dean at one of the community colleges is a result of racial discrimination directed against her by the individual defendants and by the system implemented by the District. Plaintiff claims that the individuals violated 42 U.S.C. § 1981 by depriving her of her right to contract for employment on the same basis as whites in the terms and conditions of her employment. Plaintiff alleges that the District violated 42 U.S.C. § 1983 by acting under the color of state law and depriving plaintiff of her civil rights to public employment on the same basis as whites in seeking promotion within the District.

## II

Before addressing the merits of plaintiff's claims, the Court must first examine whether or not the Eleventh Amendment to the Constitution prohibits, in full or in part, the type of action presently being sustained by plaintiff. The Eleventh Amendment states:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Although the Amendment does not provide by its specific terms, the courts have consistently held that it has the effect of prohibiting a state's own citizens (or another state's citizens) from instituting suit against the state without the state's consent. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Vaughn v. Regents of the University of California,* 504 F.Supp. 1349, 1351 (E.D.Cal.1981).

Furthermore, it is clear that the Eleventh Amendment is not limited to actions against the states *qua* states. If the action is essentially one that will, if successful, require the payment of sums out of the state treasury, then it is barred by the Eleventh Amendment. *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Put another way, the question is whether the state is the real party in interest. In this case, that question depends on whether the entity sued herein (the District) is such an agency of the State of California thereby making the State the real party in interest. If so, the District would be entitled to invoke its sovereign immunity from suit.

The question of whether the state is the real party in interest is a question of federal law, but the federal courts are instructed to consider the manner in which the state law treats the entity under examination. *Jackson v. Hayakawa,* 682 F.2d 1344, 1350 (9th Cir.1982); *Rutledge v. Arizona Board of Regents,* 660 F.2d 1345, 1349 (9th Cir.1981). Whether under state law the entity is treated as the state; if it is

permitted to sue and to be sued; and if it essentially operates independently of the state are relevant criteria in making the determination. *Rutledge,* 660 F.2d at 1349. The crucial factor is whether the named defendant has such independent status that a judgment against the defendant would not impact the state treasury. *Jackson v. Hayakawa,* 682 F.2d at 1350 citing *Edelman v. Jordan,* 415 U.S. at 664, 94 S.Ct. at 1356.

Neither the state nor the federal courts have ruled on the Eleventh Amendment status of the state's community college system, but several courts have held, in analogous situations, that the state college systems are "alter ego's" of the state and thus accorded immunity under the Eleventh Amendment. *See, e.g., Jackson v. Hayakawa,* 682 F.2d at 1350 (the California State Colleges and Universities are state agencies and enjoy immunity under the Eleventh Amendment); *Vaughn v. Regents of University of California,* 504 F.Supp. at 1351–1354 (Regents are a state agency immune from suit); *Rutledge v. Arizona Board of Regents,* 660 F.2d at 1349 (Regents and the University are state agencies immune from suit). Other circuits are in accord with this position.[1] Despite the authority in support of the immunity argument in this context, the court must nevertheless consider the status of *this* particular college system to conclude whether it is immune by virtue of the Eleventh Amendment. In doing so, it must consider the treatment given by the state courts, the relevant considerations cited above, and the particular function at issue in this litigation.

■ Under California law, the education of the citizenry is an exclusive state function that cannot be delegated. *Hall v. City of Taft,* 47 Cal.2d 177, 181, 302 P.2d 574 (1956). The public schools of the state are a matter of statewide concern, their establishment, regulation and operation are governed by the state Constitution and the state legislature is given comprehensive powers in relation thereto. *Id.,* at 179, 302 P.2d 574.[2] Education has been characterized by several courts as "plainly a state function," and school districts have been perceived as merely agencies of the state for the local operation of the state school system. *See Board of Education of the Palo Alto Unified School District v. The Superior Court of Santa Clara County,* 93 Cal.App.3d 578, 155 Cal.Rptr. 839 (1979), citing, *Hall v. City of Taft,* 47 Cal.2d at 180–181, 302 P.2d 574; *Lerner v. Los Angeles City Board of Education,* 59 Cal.2d 382, 398–399, 29 Cal.Rptr. 657, 380 P.2d 97

---

1. The majority of federal courts which have considered the "alter ego" relationship of a state university to its state have concluded that a suit against the university is a suit against the state for purposes of the Eleventh Amendment. *See, e.g., Perez v. Rodriguez,* 575 F.2d 21 (1st Cir.1978); *Jagnandan v. Giles,* 538 F.2d 1166 (5th Cir.1976), *cert. denied,* 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1083 (1977); *Prebble v. Brodrick, supra; Long v. Richardson,* 525 F.2d 74 (6th Cir.1975); *Thonen v. Jenkins,* 517 F.2d 3 (4th Cir.1975); *Brennan v. University of Kansas,* 451 F.2d 1287 (10th Cir.1971); *Williams v. Eaton,* 443 F.2d 422 (10th Cir.1971); *Walstad v. University of Minnesota Hosps.,* 442 F.2d 634 (8th Cir.1971); *Weisbord v. Michigan State University,* 495 F.Supp. 1347 (W.D.Mich.1980); *An-Ti Chai v. Michigan Technological University,* 493 F.Supp. 1137 (W.D.Mich.1980); *Zentgraf v. Texas A & M University,* 492 F.Supp. 265 (S.D.Tex.1980); *but see, e.g., Samuel v. University of Pittsburgh,* 538 F.2d 991 (3d Cir. 1976); *Dyson v. Lavery,* 417 F.Supp. 103 (E.D. Va.1976); *Gordenstein v. University of Delaware,* 381 F.Supp. 718 (D.Del.1974).

2. California's Constitution, article IX, section 5, mandates:

"*The Legislature shall provide for a system of common schools ...."* (Emphasis added.)

The state Constitution, article IX, section 14, has further ordained:

"The Legislature shall have power, by general law, to provide for the incorporation and organization of school districts, high school districts, and community college districts, of every kind and class, and may classify such districts.

"The Legislature may authorize the governing boards of all school districts to initiate and carry on any programs, activities, or to otherwise act in any manner which is not in conflict with the laws and purposes for which school districts are established."

The Legislature has accordingly provided "for a system of common schools ..." It has enacted a detailed and comprehensive Education Code covering, inter alia, the organization, duties, and powers of school districts and of their governing boards.

(1963). Thus, it appears the state courts have consistently treated the public school system as a state controlled organization.

It is helpful to consider the specific function plaintiff's complaint addresses in making Eleventh Amendment determinations. Plaintiff contends that the District has failed to properly maintain an effective affirmative action program as required of all affirmative action employers.[3] It was established by the evidence presented at trial that the state is substantially involved in the affirmative action program being administered by the District. Each year, the director of the program is required to submit a report for review by the state chancellor's office and the Board of Trustees. This constant supervision over the District's program gives the state an important role in its implementation.

In one sense, the District could be characterized as relatively autonomous, as it can sue and be sued (Cal.Educ.Code § 72201), may enter into contracts (Cal.Educ.Code §§ 72241.5, 72287), and may hold and convey property (Cal.Educ.Code § 72201). However, it is clear by the relevant provisions of the California Constitution that the state legislature retains a large degree of control over the community colleges. Furthermore, the District performs the essential governmental function of providing the citizens of the state with higher education. *See Vaughn,* 504 F.Supp. at 1353.

■ Finally, and most important, any money judgment awarded against the District would necessarily be satisfied with state funds and thus amount to an award from the state treasury. This is precisely what is addressed and forbidden by the Eleventh Amendment. The beneficial ownership of all property of the state school systems is vested in the state. *Hall v. City of Taft,* 47 C.2d at 181, 302 P.2d 574. Furthermore, school moneys belong to the state, and the apportionment of funds to a school district does not give that district a proprietary right therein. *Butler v. Comp-*

*ton Junior College District,* 77 Cal.App.2d 719, 729, 176 P.2d 417 (1947). The evidence presented on this issue included uncontroverted testimony that virtually all property possessed by the District is in fact state owned, and further that all (or substantially all) of the funding in support of the District is derived from the state itself.

■ Having balanced the various factors, it is apparent that the District is the type of state agency that enjoys Eleventh Amendment immunity equal to that afforded the state itself. If claims for monetary relief are barred, then as to the state and its agencies, injunctive relief is unavailable as well. *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *V.O. Motors, Inc. v. California State Board of Equalization,* 691 F.2d 871 (9th Cir.1982). Thus, in this case, no action may be maintained against the District for monetary damages or for injunctive relief absent an express waiver of immunity from the State of California. As no evidence of waiver was presented to the Court (and the Court is unable to discover a waiver in this context), the District is immune from suit and is entitled to have judgment entered in its favor accordingly.

### III

■ The individual defendants sued are Leslie Koltai, Chancellor of the District; and Mary E. Lee, the director in charge of the affirmative action program at Pierce College. Plaintiff contends that these individuals have deprived plaintiff of her civil rights to contract for employment on the same basis as whites in the terms and conditions of her employment. 42 U.S.C. § 1981. It is well settled that if the claims for monetary relief against the state agency are barred by the Eleventh Amendment, then those same claims against the individual representatives of the agency, acting in their official capacity, are likewise barred. *Jackson v. Hayakawa,* 682 F.2d at 1350.

---

**3.** It is not disputed that the District is an affirmative action employer. *See* 41 C.F.R. § 60 *et seq.*

This is the case because actions against the officer are, in essence, actions against the governmental entity of which the officer is an agent. *Id.*

However, damage actions against the persons as *individuals,* and actions seeking injunctive relief against the persons in their official capacity are not barred by the Eleventh Amendment. Since the seminal decision of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), it has been clear that actions seeking injunctive relief against state officials stand on a much different footing than do actions for damages. While actions for retroactive monetary relief are prohibited by the Eleventh Amendment, the prohibition has no effect on actions for prospective injunctive relief. *See Hutto v. Finney,* 437 U.S. 678, 690, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978); *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979).

Furthermore, damage actions against individuals are not barred simply because they hold government office—they are only barred to the extent the individuals are sued in their official capacity. As the Supreme Court noted, "the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under color of state law . . . ." *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (Court reversed holding which dismissed the individual defendants sued in their individual capacity.) Therefore, the court must now consider the merits of plaintiff's claims and determine whether she has established, by a preponderance of the evidence, that the individual defendants have violated 42 U.S.C. §§ 1981 or 1983.

### A. *Plaintiff's § 1981 Claim.*

Plaintiff contends that the individual defendants acted in a manner to deprive her of her civil rights to contract for employment on the same basis as whites in the terms and conditions of her employment, thereby violating 42 U.S.C. § 1981. It is well settled that to sustain a cause of action under § 1981, plaintiff must establish intentional discrimination directed against her personally. *General Building Contractors Ass'n. v. Pennsylvania,* 375 U.S. 458, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). Claims for employment discrimination pursuant to § 1981 are treated in a similar manner as are disparate treatment cases brought pursuant to Title VII, 42 U.S.C. § 2000e–3(a). Although the statutes are not parallel in terms of their scope of application [4] the Ninth Circuit has held that a § 1981 claimant may rely on Title VII discriminatory treatment standards in proving a prima facie case. *Gay v. Waiters and Dairy Lunchmen's Union,* 694 F.2d 531, 538–539 (9th Cir.1982) (*Gay*). The Court there recognized that a § 1981 claimant is not *limited* to the Title VII criteria for proving a prima facie case, but instead the claimant's case and the court's analysis in connection with the prima facie case may properly be guided by these standards.

This court's analysis of plaintiff's § 1981 claim should therefore proceed along the line of inquiry established for Title VII actions in the case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (*McDonnell Douglas*). There, the Court established the appropriate "order and allocation of proof" in disparate treatment lawsuits. *McDonnell Douglas,* 411 U.S. at 800, 93 S.Ct. at 1823. It is clear that the plaintiff has the ultimate burden of persuasion on the issue of discriminatory intent. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (*Burdine*). However, as the Ninth Circuit recognized in *Gay,* the burden of

---

4. Title VII prohibits employment discrimination on account of race, sex, religion, and national origin. 42 U.S.C. § 2000e–2(a). Section 1981, which provides that all persons "shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," is limited to a prohibition of racial discrimination. *Ru-*

*nyon v. McCrary,* 427 U.S. 160, 167–68, 96 S.Ct. 2586, 2592–2593, 49 L.Ed.2d 415 (1976). Title VII and section 1981 are thus overlapping, but independent remedies for racial discrimination in employment. *Johnson v. Railway Express Agency,* 421 U.S. 454, 461, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975).

*production* in the case, "sometimes referred to as the burden of going forward with evidence sufficient to avoid a directed verdict or judgment as a matter of law, shifts." *Gay,* 694 F.2d at 538, *citing Burdine,* 450 U.S. at 253–256, 101 S.Ct. at 1093–1095. Plaintiffs initial burden is to come forward with evidence to show that the actions taken by the employer, if otherwise unexplained, create an inference that it was "more likely than not" that the action was based on race or another impermissible criteria. *Gay,* 694 F.2d at 538. The burden of production then shifts to the defendant employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Finally, plaintiff must be afforded a fair opportunity to show that defendants stated reasons are pretextual for unstated discriminatory purposes. *Id.,* at 804, 93 S.Ct. at 1825. This order of proof is designed to "progressively sharpen the inquiry into the elusive factual question of intentional discrimination." *Burdine,* 450 U.S. at 255 n. 8, 101 S.Ct. at 1094 n. 8.

■ Pursuant to the four-part test established in *McDonnell Douglas,* plaintiff's initial burden is satisfied by showing (1) plaintiff belongs to a protected class, (2) plaintiff applied and was qualified for the promotion the employer was seeking applicants for, (3) that despite her qualifications she was rejected, and (4) the employer continued to seek applicants with plaintiff's qualifications. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. The courts have emphasized that the *McDonnell Douglas* criteria are not the *only* mode of estab-

lishing a prima facie case. The criteria should be applied flexibly, and considered in connection with other relevant circumstantial evidence including statistical data,[5] the presence of subjective hiring and promotion practices, and other appropriate evidence on the issue. The focus of the inquiry at this stage must be whether, in light of all the relevant criteria, plaintiff has produced enough evidence to raise an inference of intentional discrimination to shift the burden of production to the defendant.

■ Having considered all of the relevant evidence in this matter, the Court concludes that plaintiff has established her prima facie case. Plaintiff, a black woman, clearly belongs to a racial minority. She applied for the dean's position, and was placed among the pool of qualified applicants.[6] Despite her qualifications she was rejected for an interview much less the position she sought. Finally, the dean's position at the several schools remained open and defendants continued to seek applicants from persons of the plaintiff's qualifications, those in the same applicant pool. Plaintiff has therefore satisfied the four-part *McDonnell Douglas* prima facie case and has thereby raised the minimal inference of discriminatory treatment necessary to shift the burden of production to the defendant.[7]

Recently the Ninth Circuit had cited the relevant criteria to apply when the employer is faced with a prima facie case of discrimination under the disparate treatment theory:

applicant during the last five years. Mr. Spaeter, Vice Chancellor for personnel services, testified that approximately 150–180 eligible candidates make up the "pool."

---

5. The use of statistical data has expressly been condoned in a disparate treatment case in connection with plaintiff's initial prima facie showing. *See, Gay v. Waiters and Dairy Lunchmen's Union,* 694 F.2d 531, 550 (9th Cir.1982) and cases cited therein.

6. Defendants do not dispute the fact that all applicants whose applications were placed in the "eligible pool" had been screened and possessed at least the basic qualifications for the dean's position. After the application is deemed qualified for the "pool," tracers are sent out to references that are either designated by the applicant or had worked with the

7. Plaintiff's immediate burden of production is discharged by the proof of the *McDonnell Douglas* elements. The court notes that the statistical evidence offered by plaintiff lends additional support to her prima facie case. At two of the schools, there had never been a black dean, and the percentage of black administrators generally was lower than at other inner city campuses.

The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions. *Felton v. Trustees of California State Universities and Colleges, et al.,* 708 F.2d 1507, 1508–09 (9th Cir.1983), citing *Burdine,* 450 U.S. at 254–56, 101 S.Ct. at 1094–95 (citations and footnotes omitted). The question then is whether defendant has sufficiently countered plaintiff's prima facie showing by introducing evidence that the failure to consider her for the dean's position was based on legitimate, nondiscriminatory criteria.[8]

Defendants contend that plaintiff was not interviewed or selected for one of the four open dean's positions because her application and references were not competitive with the other applicants. Dr. Mary Lee testified regarding the qualities most sought after in a dean applicant. A dean must deal with the faculty in curriculum and union problems; must function with an ever declining financial base; is required to be firm, but not authoritative; and, ideally, will have excellent personal relations skills, as the dean's position is often one of diplomat and representative. The district also issues an announcement of dean's position opening, listing several required and desirable qualifications. Among the latter is "personal characteristics necessary for working with students, employees and the public in an administrative capacity including wholesome personality, stability, good judgment, tact and ability to cooperate with others."

Plaintiff's application is impressive, as it describes her educational and employment history in great detail. Plaintiff attended seven post-secondary institutions, including three outside this country.[9] Plaintiff acquired her doctorate in education from the University of Southern California in 1981. Between 1975 and 1982, plaintiff had been employed by the District as both an assistant dean and an acting dean at the East Los Angeles and the Los Angeles Valley campuses. Plaintiff has been involved in several community and cultural activities, and is a member of numerous professional organizations. Finally, plaintiff has presented a variety of professional papers to educational workshops and conferences between the years 1976–1981.

Plaintiff's application makes up only a part of the information upon which a decision is made. Equally (if not more) important are the "tracers" sent out to prior

---

**8.** Several witnesses testified about the nature of the dean selection process. As with all hiring and promotion actions taken by the District, one underlying consideration is the affirmative action program currently in force. However, in connection with plaintiff's § 1981 cause of action, the existence or non-existence of an effective affirmative action program is largely irrelevant. The Court's present inquiry must focus on the stated "legitimate" reasons for not promoting plaintiff to determine if those reasons were proper or merely a pretext.

**9.** Plaintiff attended Boston University, Washington University, University of Oslo, University of Mexico, Sorbonne, California State University, and University of Southern California.

supervisors and other references.[10] In plaintiff's case, approximately fifteen tracers were part of her application package at the time it was reviewed. The tracer requires the supervisor to rate the applicant in fourteen different areas as (1) below average; (2) average; (3) above average; and (4) far above average.[11] The tracer also asks for comments on strength and weaknesses, and finally requests an overall evaluation ("marginal," "average," "strong" or "outstanding"). As noted, these tracers provide actual job performance evaluations, and are thus entitled to substantial weight in the selection process.

Plaintiff's tracers are mixed in terms of their evaluation of her performance and potential. As to the fourteen categories, approximately 15% were marked "average," 45% were marked "above average," and 35% were marked "far above average." As to her overall "potential" evaluation, she was rated "marginal" once, "average" six times, "strong" seven times and "outstanding" three times. Comments on her performance were mixed, but the most notable comments on areas needing improvement concern plaintiff's need to improve personal relations with other employees. The comments in this regard include, "Has difficulty relating to classified employees" (found on three tracers); "Has a manner of expressing herself that has been taken by others as 'talking down'"; "Needs to be less rigid. Needs to listen"; "Perceived by subordinates as overbearing"; and "Needs to improve relationships." Otherwise, the comments on plaintiff's tracers were generally complimentary.

The applicants ultimately selected for the open deans' positions were Noel Korn (East Los Angeles); Raul Cardozo (Los Angeles Mission); Jean Loucks (Pierce); and Edwin Young (Valley). Mr. Korn holds a masters degree from U.C.L.A., has a wide range of community and professional affiliations, and has extensive publications in the field of anthropology. Eleven tracers were part of his application, and he was rated (in the fourteen categories) 25% "above average" and 70% "far above average" (Korn did not receive an "average" rating). His overall evaluation included one "average;" three "strong" and seven "outstanding." Certain early references cited one drawback as Mr. Korn's lack of administrative experience, but overall the comments on Mr. Korn's abilities as an administrator, organizer and motivator were excellent.

Mr. Cardozo has a masters degree from Cal. State Los Angeles, and was in the proposal stage of his doctorate dissertation at U.C.L.A. He has several qualifying credentials, and had been employed as an acting assistant dean of instruction at East Los Angeles College for several years. His community involvement was extensive, and he is affiliated with several professional organizations. Fourteen employment tracers were considered, and Mr. Cardozo was rated "average" 1%, "above average" 30%, and "far above average" 67%. His overall evaluations included "strong" twice and "outstanding" eleven times. Finally, all of the comments on Mr. Cardozo were outstanding, lavishly praising him for motivation, responsibility and dedication to the task at hand. No weaknesses were recorded, other than his tendency to work too hard.

Mrs. Loucks, the successful applicant at Pierce College, obtained her masters degree in physical education from Cal. State Los Angeles. Her holdings of California credentials are varied, and she had served as the Assistant Dean of Student Services and Assistant Dean of Instruction at Pierce College since 1975. She is also a member of several professional organizations. Nine

---

10. The testimony at trial indicated that the tracers are the most important factor in the evaluation process. As these forms reflect an employee's past *performance*, and not merely activities or degrees and credentials, this is a reasonable and fully believable conclusion to draw.

11. The fourteen areas include, knowledge in area of evaluation; ability to communicate; ability to plan work without close supervision; tendency to cooperate with other employees; tendency to show initiative; perseverance in completing tasks; leadership ability; and dependability.

tracers were a part of her file, and Mrs. Loucks never was rated "average;" was rated "above average" 10% of the time and was rated "far above average" in 90% of the responses. Mrs. Loucks was also rated "outstanding" in her overall potential in eight of nine evaluations, and was once rated "strong." The remarks were uniformly outstanding, and in general her tracers left absolutely no doubt about her abilities as an administrator.

Dr. Young received his doctorate from U.C.L.A., and had two masters degrees from U.S.C. He served as Acting Dean of Instruction at Valley College and Acting Dean (and Assistant Dean) of Student Services at Pierce College. Dr. Young's application indicates extensive community involvement, several publications, and membership in numerous professional organizations. Twelve tracers were part of his application, and his ratings in the fourteen categories were 20% "above average" and 78% "far above average." His overall evaluation was "average" once, "strong" three times and "outstanding" eight times. The comments on his references, particularly the most recent references, indicate an unhesitating endorsement of Dr. Young for the position of Dean.

■ Having considered all of the objective evidence presented,[12] the Court concludes that defendants have adequately rebutted plaintiff's prima facie case. No precise formula exists for comparing the scores of applications, but it is clear that the successful applicants' records and tracers overall reflect a highly qualified group of individuals, each of whom were equally or better suited for the position of dean as plaintiff. Testimony at trial supports the conclusion that the selection process was "color blind" and properly sought out the best applicant for the job. Several witnesses testified about the District's hiring and pro-

motion practices and the affirmative action program, and the overall impression of the program was very positive. The selection process appears, from the weight of the evidence, to be carefully structured to seek the most qualified applicants while at the same time incorporating the District's affirmative action goals.

The Court notes that school officials are experienced in the evaluation and selection of administrators and teachers, while the courts are not. As one court declared:

> This Court can and must review the credentials of the various applicants with a non-discriminatory eye. It will not, however, act as another superintendent for the Moberly School District. At certain points in the hiring process an administrator must exercise judgment. If the defendants can show that a reasonable system of evaluation is applied in a non-arbitrary manner, the Court will not substitute its judgment for defendants'.

*Oliver v. Moberly Missouri School District,* 427 F.Supp. 82, 87 (E.D.Miss.1977), citing *Smith v. Board of Education of Morrilton School Dist. No. 32,* 365 F.2d 770 (8th Cir. 1966). The fact that a part of the selection process is based on subjective evaluations does not render the process inherently suspect unless there is independent evidence of discriminatory motivations. Section 1981 in no wise prevents an employer from utilizing subjective criteria, but only prohibits *intentional* discrimination based on race. On the basis of defendants' objective and subjective criteria, any inference raised by plaintiff's prima facie case has been adequately rebutted by defendants' showing.

Plaintiff now has the opportunity to prove, by a preponderance of the evidence, that defendants' reasons are pretextual and that she was in fact the victim of racial discrimination. As the Ninth Circuit recently stated:

---

12. The Court recognizes that the tracers and applications are not totally "objective" in that the evaluations are made by individuals who in large part have certain "subjective" ideas of plaintiff's performance. However, this problem arises in connection with any promotion selection process. As one court noted, "Col-

lege grades and recommendations ... are certainly a reflection of someone's subjective evaluation. But when viewed by an employer, they speak from the cold certainty of a printed page." *Oliver v. Moberly Missouri School Dist.,* 427 F.Supp. 82, 87 (E.D.Mo.1977).

The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Felton,* 708 F.2d at 1509. Plaintiff attempts to prove that defendants' reasons are pretextual largely on the basis of statistical data indicating a lower proportion of black deans, especially at the Valley and Pierce Colleges. However, statistical evidence is not highly probative on the ultimate issue of intentional discrimination under § 1981. This is because plaintiff must establish more than mere disparate impact—she must prove, by a preponderance of the evidence, *intentional* discrimination as to her individually. To be sure, statistical evidence is not irrelevant, especially in circumstances where there is an otherwise unexplained rejection of minority applicants. *See Furnco Construction Co. v. Waters,* 438 U.S. 567, 579–580, 98 S.Ct. 2943, 2950–2951, 57 L.Ed.2d 957 (1978). However, there is no evidence of a "systematic exclusion" of black deans from the District to warrant a finding of *intentional* discrimination. *See Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Indeed, the statistical evidence demonstrates that the District had met its affirmative action "goals" in executive administrative positions for black minorities on a district-wide basis.[13]

 Plaintiff bears the ultimate burden of persuasion on the issue of intentional discrimination under § 1981. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. Considering all of the evidence presented in this matter, the Court concludes that plaintiff has failed to successfully carry that burden. Assuming plaintiff's prima facie case is sound, defendants have successfully rebutted any inference of intentional discrimination by presenting to the Court a merit-based selection process which rightfully depends on some amount of subjectivity in the final analysis.

### B. *Plaintiff's § 1983 Claim.*

 Plaintiff alleges that defendants have acted under color of state law to deprive plaintiff of her civil rights to public employment on the same basis as whites in seeking promotion in her employment. Plaintiff acknowledges that to establish her case under § 1983 she likewise must prove, by a preponderance of the evidence, that defendants acted intentionally, with a purpose to discriminate against her. Having already determined that plaintiff has failed to establish intentional discrimination under § 1981, this issue is effectively closed.

Plaintiff contends that she has a right to an effective and meaningful affirmative action program, and that defendants have failed to provide her the opportunities required by such a program. Assuming arguendo that the right to this program falls under the penumbra of § 1983 claims, the evidence at trial manifested the existence of a well established and fully functional affirmative action program with realistic goals and timetables set by the District. As to black minorities, the District had met its goals in each of the seven employment categories.[14] The testimony at trial further demonstrated that the selection committees followed all guidelines established in connection with the affirmative action program, and further that no complaints about the program were lodged by either state or federal officials to whom reports on the program's progress are given.

### IV

In conclusion, the Court finds plaintiff to be a highly motivated and well qualified

---

**13.** See "Affirmative Action Report—1982," at p. 5.

**14.** *Id.,* p. 5–6.

individual. Indeed, defendants do not contend otherwise. However, the failure to select plaintiff as the dean for one of the four available openings simply was not the result of intentional racial discrimination. Plaintiff has failed to prove, by a preponderance of the evidence that the reasons given for not promoting her are pretextual for illegitimate discriminatory motives. All employment or promotion decisions require that the employer "discriminate" between applicants. The law only requires that this discriminating process not be based on unlawful criteria. Having failed to establish that defendants utilized such criteria as to plaintiff herein, judgment will be entered for the defendants accordingly.