**Phyllis S. STONES, Plaintiff-Appellant,**

**v.**

**LOS ANGELES COMMUNITY COLLEGE DISTRICT, Leslie Koltai,' and Mary E. Lee, Defendants-Appellees.**

**No. 83–6329.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 5, 1985.

Decided Aug. 1, 1986.

---

**271**

Before CHAMBERS, ANDERSON, and NORRIS, Circuit Judges

NORRIS, Circuit Judge:

Dr. Phyllis Stones, a highly credentialed and accomplished black woman educator,[1] has made her career in the Los Angeles Community College District ("District") since 1962. After a brief appointment as an acting dean in charge of resource development at East Los Angeles College—abbreviated by the district-wide abolition of that position in 1978 due to funding cutbacks—Dr. Stones was transferred to Los Angeles Valley College, where she has served as an assistant dean of instruction ever since. Four times between 1978 and 1982, Dr. Stones was passed over for promotion to be a full dean of instruction although her application was on file in the District's "Deans' pool" and she believed herself objectively better qualified than the candidates who were chosen as deans.

In this civil rights action filed against the District, its chancellor, and the president of Valley College, Dr. Stones claims that the District's failure to promote her violated her right to contract under 42 U.S.C. § 1981 and her right to civil employment free of racial discrimination under 42 U.S.C. § 1983. To support her right to relief, she makes the following factual claims: (1) the District's ostensibly open, systematic and colorblind promotion policy is a sham used to validate the invidious hiring preferences of college presidents; (2) the Chancellor conveyed to her informal guarantees of promotion that he failed to honor; and (3) particularly with respect to high-level administrative positions at the predominantly white San Fernando Valley campuses, the District has neglected to fulfill the detailed affirmative action require-

Bruce M. Stark, Long Beach, Cal., for plaintiff-appellant.

Mary L. Dowell, Los Angeles, Cal., for defendants-appellees.

---

1. Dr. Stones's curriculum vitae reflects her dedication to her career. Dr. Stones received a bachelor of science degree from Boston University in 1949 and a master's degree in dance and physical education from Washington University in Saint Louis in 1953. She studied ethnic dance in Norway on a Fulbright scholarship in 1957. More recently, in 1981, she earned a doctorate in post-secondary education from the University of Southern California, having submitted a commended doctoral thesis that analyzed the effect of Proposition 13 on multi-campus community colleges in California. Dr. Stones has presented a number of papers at educational workshops and conferences; she also takes an active part in charitable and cultural affairs.

ments incumbent on it as a recipient of federal funds. Dr. Stones seeks to enjoin the defendants from interfering with her right to be promoted; she also seeks backpay to compensate her for her salary losses due to racial discrimination and one million dollars in punitive damages.

Judgment was entered for defendants following a four-day bench trial. *See Stones v. Los Angeles Community College District,* 572 F.Supp. 1072 (C.D.Cal.1983). Dr. Stones raises two issues on appeal: (1) whether the district court's finding that she was not the victim of intentional racial discrimination should be set aside as clearly erroneous; and (2) whether the Eleventh Amendment bars her suit against the District.

## I

The district court concluded that Dr. Stones's suit for backpay against the District was barred by the Eleventh Amendment because state law treats the District as an arm of the state, *see Mount Healthy City Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977), and a money judgment levied against the District would be paid out of state-appropriated funds. 572 F.Supp. at 1078; *see Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974); *see also Rutledge v. Arizona Board of Regents,* 660 F.2d 1345, 1349 (9th Cir.1981). If the District is properly characterized as an arm of the state, Dr. Stones's suit to enjoin it would also be barred. *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *see also Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984) (Eleventh Amendment proscribes suit against state agencies "regardless of the nature of the relief sought"). However, we need not reach the Eleventh Amendment question

on this record, because even were we to find that the District is shielded from suit by the state's sovereign immunity, Dr. Stones could still recover from the individual defendants in their individual capacity as well as obtain prospective injunctive relief. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Thus, regardless of the District's Eleventh Amendment status, we have jurisdiction to reach the merits of plaintiff's appeal. As we explain in Part II, her appeal fails on the merits. Accordingly, on this record, we need not decide the theoretical—and, we note, quite difficult—question whether judgment against the District would violate the Eleventh Amendment.[2]

## II

### A

42 U.S.C. § 1981 secures to all persons "the same right ... to make and enforce contracts ... as is enjoyed by white citizens." Noting its origins in Reconstruction Era legislation, the Supreme Court has limited section 1981 to claims of racial discrimination. *Runyon v. McCrary,* 427 U.S. 160, 168–72, 96 S.Ct. 2586, 2593–95, 49 L.Ed.2d 415 (1976); *Johnson v. Railway Express Agency,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975). Further, to recover, a plaintiff must prove that the defendant acted against him with discriminatory intent. *General Building Contractors Association v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982) ("§ 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination"); *see also Craig v. County of Los Angeles,* 626 F.2d 659, 668 (9th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1364, 67 L.Ed.2d 345 (1981). The district court's finding with respect to the "elusive factual

**2.** *See Patsy v. Florida Bd. of Regents,* 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 2567 n. 19, 73 L.Ed.2d 172 (1982) (avoiding, on prudential grounds, the decision whether Board of Regents is arm of the state for Eleventh Amendment purposes); *see also* 13 C. Wright, A. Miller & E.

Cooper, *Federal Practice and Procedure* § 3524, pp. 167–68 (acknowledging that jurisdictional status of Eleventh Amendment is ambiguous: *e.g.,* unlike other bars to subject matter jurisdiction, states may consent to suit through an unequivocal waiver of immunity).

question," *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1094 n. 8, 67 L.Ed.2d 207 (1981), of intentional racial discrimination is a finding of fact, subject to appellate review under the clearly erroneous standard of Fed.R.Civ.P. 52(a). *Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *see also Pullman-Standard v. Swint,* 456 U.S. 273, 288, 102 S.Ct. 1781, 1789, 72 L.Ed2d 66 (1982) ("issues of intent [are] factual matters for the trier of fact"). Under this deferential standard, we may not reverse the district court's findings of fact unless upon reviewing the evidence we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed.746 (1948), *quoted in Anderson v. Bessemer City,* 105 S.Ct. at 1511; *see also Casillas v. United States Navy,* 735 F.2d 338, 343 (9th Cir.1984) ("we will not ransack the record, searching for mistakes").

### B

Since 1978, when she was relocated to Valley College and sustained a reduction in position and pay, Dr. Stones has kept an updated application on file in the "Deans' pool". According to the district court's findings, the Deans' pool is a color-blind list of about 180 applicants, each of whom is deemed qualified to assume a dean position and is considered—without further expressions of interest—whenever openings arise. 572 F.Supp. at 1075. The district court set out in conscientious detail the procedure apparently used to fill openings from this list. *Id.* First, the college president designates a search committee consisting of several faculty members, incumbent deans, perhaps a student and the president himself. This committee examines all interested applications in the Deans' pool, looking both at the applicant's resume and at confidential "tracers" elicited from the applicant's supervisors that predict, based on past job performance, whether the applicant is temperamentally and professionally suited to be dean. On this basis, the search committee interviews the five to ten candidates it considers best qualified and afterwards recommends two names to the Chancellor. The Chancellor then forwards his choice from among these two names for final approval by the Board of Trustees.

From 1978 through 1982, the period relevant to this lawsuit, four dean of instruction positions were filled at community colleges in the District. Dr. Stones was neither called to interview nor ultimately hired for any of these openings. The successful applicants, in chronological order, were as follows: (1) in 1979, Noel Korn, a white male, was chosen to be dean of instruction at East Los Angeles College; (2) in 1980, Raul Cardozo, a Latino male, was chosen to be dean of instruction at Los Angeles Mission College; (3) in 1982, Jean Loucks, a white female, was chosen to be dean of instruction at Pierce College; (4) in 1982, Dr. Edwin Young, a white male, was chosen to be dean of instruction at Valley College. The district court found that although plaintiff's objective credentials were competitive with those of the successful applicants, she rated consistently below them in her confidential references, an "[e]qually (if not more important)" element of the hiring decision. 572 F.Supp. at 1081. In particular, the court found that many of her "tracers" characterized Dr. Stones as condescending to subordinates, rigid, generally in need of improving her communicative and diplomatic skills. *Id.* at 1082. In contrast, by far the greater number of "tracers" solicited on the actual dean designees gave them outstanding ratings, and the comments reflected uniform confidence that they were personally qualified to be deans. *Id.* at 1082–83.

Plaintiff offered only circumstantial evidence in support of her claim that the District's rejection of her for promotion was based upon the impermissible criterion of race. For instance, she testified at trial that for some six months after her transfer to Valley College, she was quartered in inconvenient temporary space in the college cafeteria and moved to the central administrative building only after repeated protest.

She further testified that, despite the illusion of an open, objective promotion policy, it was common lore in the District that college presidents and the District Chancellor rigged the system to ensure that their personal favorites would be recommended by the search committee and thereafter appointed. Finally, Dr. Stones argues that the District's affirmative action program departs from the specifications laid out in 41 C.F.R. Part 60–2 (1984) and made binding on federal contractors. In particular, she stresses the requirement that the contractor achieve integration objectives at "each of its establishments," 41 C.F.R. § 60–2.2, and points to the fact that since 1978 no black dean has been appointed or served at any of the San Fernando Valley campuses.[3]

The district court determined that plaintiff had made out a prima facie case of proscribed discrimination by meeting the four-part test of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[4] The court ruled, however, that the District had rebutted plaintiff's prima facie case by advancing a legitimate, nondiscriminatory basis for her rejection: based on the confidential evaluations given by her supervisors, Dr. Stones displayed less tact and flexibility as an administrator than the candidates who were actually hired for the job. 572 F.Supp. at 1083. The district court acknowledged that these evaluations were necessarily subjective, thus resistant to precise comparison. *Id.* at 1083 & n. 12. Nonetheless, upon careful consideration of the testimony at trial, the court found that "the selection process was 'color blind' and properly sought out the best applicant for the job." *Id.* at 1083. The court also found that the process was "carefully structured to seek the most qualified applicants while at the same time incorporating the District's affirmative action goals." *Id.*

Finally, the district court considered whether plaintiff had met her burden of proving that the District's proferred explanation was merely a pretextual screen for racial discrimination. *See Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. Dr. Stones

---

**3.** Plaintiff's expert witness testified to the following deficiencies in the District's affirmative action program: (1) the District's use of secret "tracers" permits imperceptible racial bias and cronyism to contaminate the promotion system, in violation of 41 C.F.R. § 60–2.24; (2) satisfaction of the program's hiring objectives is laxly monitored, flouting the spirit of 41 C.F.R. § 60–2.10 (requiring "specific and result-oriented procedures" as well as "good faith efforts … to correct the deficiencies"); finally, (3) no written justifications are submitted when "apparently qualified minority … employees are passed over for upgrading." *Id.* § 60–2.24(f)(6).

We note, first, that the technical guidelines that the District allegedly violated are either precatory or susceptible of a more flexible interpretation than plaintiff ascribes to them. Second, even if the expert's criticisms are accepted as valid, they do not establish the "substantial deviation" required to trigger a proceeding to enforce the regulations. *Id.* § 60–2.2(c)(1). Finally, Ernestine Palmer, the District's acting director in charge of affirmative action, testified that the District had taken exhaustive, good-faith steps to increase the representation of minorities in all seven EEOC job categories; that the District submitted annual compliance reports to state and federal authorities; and that these reports documented substantial progress toward meeting hiring goals that were particularized on a campus-by-campus basis. Good faith efforts in furtherance of a written affirmative action program are all that the regulations require. *Id.* §§ 60–2.1(a), 60–2.10.

**4.** The *McDonnell-Douglas* test raises a rebuttable presumption of discrimination whenever a minority is qualified, applies for a position, is rejected, and the employer continues to advertise for the position after her rejection. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. The effect of the presumption is to shift to the defendant the burden of production: in particular, the defendant must come forward with evidence indicating a legitimate, nondiscriminatory basis for the rejection. *Id.* The ultimate burden of persuading the trier of fact that the employer was motivated by a racially discriminatory animus does not shift with the burden of production but remains at all times with the plaintiff. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *see generally Gay v. Waiters and Dairy Lunchmen's Union,* 694 F.2d 531, 538–39 (9th Cir.1982) (despite its status as a distinct statutory remedy, a prima facie showing of a § 1981 violation may be made out by tracking the "order and allocation of proof" prescribed for Title VII disparate treatment claims.)

offered in evidence statistical charts indicating a concentration of white deans and a corresponding underrepresentation of black deans at the San Fernando Valley campuses.[5] *See Furnco Construction Corp. v. Waters,* 438 U.S. 567, 580, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978) (evidence of racial imbalance in an employer's workforce "is not wholly irrelevant" to the question of intent). The district court found these charts relevant to a finding of desperate impact but insufficient "to warrant a finding of *intentional* discrimination." 572 F.Supp. at 1084 (emphasis in original). Moreover, observing that the District was running a good-faith, carefully monitored and effective affirmative action program, the court rejected the premise of plaintiff's argument that the District's violation of federal affirmative action requirements evidenced discriminatory intent. *Id.* Thus, the court ruled that "defendants have successfully rebutted any inference of intentional discrimination by presenting . . . a merit-based selection process which rightfully depends on some amount of subjectivity in the final analysis." *Id.*

The district court explicitly rejected the two factual contentions that were the key to plaintiff's case: *i.e.*, (1) the subjectivity inherent in the District's merit-based promotion system was manipulated to guarantee the promotion of favored white candidates; and (2) the District was in default of its federal affirmative action requirements. After determining that these contentions were rebutted by credible evidence in the record, the district court rejected plaintiff's claim that she was the victim of intentional racial discrimination. Based upon our review of the record in its entirety, we believe that as "the original finder of fact,"

the district court arrived at a plausible account of the evidence. *Anderson v. Bessemer City,* 105 S.Ct. at 1512. Accordingly, we hold that the court's factual finding that the District's failure to promote Dr. Stones to a full deanship did not stem from racial discrimination is not clearly erroneous.

### C

Under section 1983, a plaintiff claiming racial discrimination in employment must also prove that the employer was motivated by a racially discriminatory purpose. *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 583 n. 16, 104 S.Ct. 2576, 2590 n. 16, 81 L.Ed.2d 483 (1984); *Washington v. Davis,* 426 U.S. 229, 239–41, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976). Our affirmance of the district court's finding that Dr. Stones was not the victim of intentional discrimination under section 1981 thus forecloses relief under section 1983. *Peters v. Lieuallen,* 746 F.2d 1390, 1393 (9th Cir.1984).

AFFIRMED.

CHAMBERS, Circuit Judge, concurring:

I concur in Judge Norris' opinion. There were disputed questions of fact here. The district court could have found in favor of Stones on these questions, but it did not do so. It found in favor of the School District and the other named defendants. The result was not clearly erroneous.

---

**5.** After the funding cutback precipitated by enactment of Proposition 13 in 1978, the number of deanships throughout the District was reduced to a uniform complement of three deans per campus, entrusted with responsibility over instruction, student services, and administrative services, respectively. Between 1978 and 1982, plaintiff's unrebutted evidence showed that twelve deans were hired at Pierce and Valley, both located in the San Fernando valley, and that all twelve were white. At the same time, in the top EEOC–6 job category of managerial-executive positions, which embraces the gamut from college president to assistant coordinator,

the evidence showed that the distribution of minorities in "black" inner-city and "white" suburban schools has been far less skewed. For instance, in 1982, of the 17 EEOC–6 positions at Valley College, four were filled by blacks, or 24 percent—more than double the percentage called for by the District's accredited affirmative action plan. There was thus ample evidence before the trial court that the District's minority recruitment had not only met but exceeded affirmative action guidelines if measured according to broad job category, rather than—as plaintiff argued—on a discrete position-by-position basis.