Lucille A. McKENZIE, et al., Plaintiffs,

v.

The CITY OF MILPITAS, et al., Defendants.

No. C–88–20718 RPA.

United States District Court,
N.D. California.

May 21, 1990.

Jeannine M. Ushana, Amos & Ushana, San Francisco, Cal., for plaintiffs.

Gregory M. Fox, Bertrand, Fox, Elliot & Cohn, Larkspur, Cal., for defendants.

## AMENDED ORDER FOR PUBLICATION

AGUILAR, District Judge.

### INTRODUCTION

Defendants, the City of Milpitas ("the City") and Milpitas Police Chief Frank Acosta ("Chief Acosta") bring this motion to dismiss, or, alternatively, for summary judgment, based on their allegations that plaintiffs have not stated actionable claims under 42 U.S.C. §§ 1981 and 1983, and that the evidence demonstrates that neither the City nor Chief Acosta violated plaintiffs' constitutional rights. City police officers were dispatched to plaintiffs' residence following a citizen's report of a possible domestic disturbance. A confrontation ensued, and Milpitas police officers used taser guns to subdue plaintiffs Lucille McKenzie and Cecil McKenzie, Jr. The McKenzies claim that the police officers' use of tasers constitutes unconstitutionally excessive force, and plaintiff Alverta Bradford joins the McKenzies in claiming that they were arrested without cause in violation of their constitutional rights. Plaintiffs do not allege that the individual officers are liable, but instead seek recovery from the City and the Chief pursuant to *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

The complaint also alleges a violation of plaintiffs' rights under § 1981. Defendants state that the § 1981 claim must fail because there is no pleading or proof that the complained-of acts were motivated by racial animus. Plaintiffs seek leave to file a second amended complaint to allege a violation of their Fourth Amendment rights. Defendants oppose this amendment as futile.

### FACTUAL BACKGROUND

#### I. *The Incident*

On March 19, 1988, Officer Pangelinan of the Milpitas Police Department was dispatched to the McKenzie residence following a citizen's report of a possible father-son dispute occurring in front of the residence. The twenty-two year old officer had no information about the disputants or the nature of the dispute other than that he was responding to a possible domestic conflict. Officer Pangelinan arrived at the scene, saw plaintiff Lucille McKenzie and her son Anthony arguing across the street from the residence, stepped out of his car and approached the pair with his taser in his hand.

Officer Pangelinan approached to within six feet of the pair, and asked Mrs. McKenzie what was happening. She responded that it was a family matter and had been taken care of. The McKenzies started walking toward their house, and Pangelinan followed them in very close range, insisting that he had to know what was going on in order to make a report. Mrs. McKenzie turned around (Pangelinan followed so closely that when she turned, the two nearly collided), waved her finger at the officer, and told him again (in not very polite language) that the matter was family business. The officer walked across the street and called for emergency backup because he "was dealing with [Lucille McKenzie] a very irate person."

Officer Comfort arrived shortly, observed Mrs. McKenzie talking to her sister, plaintiff Alverta Bradford, and was directed by Pangelinan to watch the front porch. By this time, Cecil McKenzie, Jr., Mrs. McKenzie's son, had joined three female McKenzie relatives on the porch. Officer Comfort observed that Cecil had his fists tightly clenched and was "about ready to explode." Officer Pangelinan radioed for additional backup. Officer Ferguson arrived and, at Officer Pangelinan's instruction, took up a position on the lawn, keeping a special watch on Cecil.

Defendants state that Anthony McKenzie approached Officer Pangelinan to explain the situation to him, and that Lucille rushed out to stop her son from speaking to the officer. Alverta Bradford tried to

restrain her, and newly-arrived Officer Ferguson stepped between the sisters to end their fight. Plaintiffs, on the other hand, explain that Alverta was just trying to comfort the visibly upset Lucille, and that Officer Ferguson physically pulled the sisters apart.

According to defendants, a clench-fisted Cecil bolted across the front yard toward Officer Ferguson, ignored Officer Comfort's command to halt, and began to jump over a low fence that separated him from where Officer Ferguson stood between his mother and his aunt. Plaintiffs' version is that Cecil came to the porch, saw his mother crying on Alverta's shoulder, left the porch and ran towards her. As Cecil was about to jump over a low fence which separated the lawn from the sidewalk, he was tased in the back by Officer Comfort. Cecil "crumpled in midair, kind of went into a fetal position, came down on the sidewalk, just landed, and then rolled over on his stomach." Deposition of Officer Mark Ferguson at 71:6–15. Officer Ferguson immediately handcuffed Cecil.

Lucille thought that the police had shot her son with a handgun, and started running toward Cecil and Officer Ferguson. Officer Pangelinan shouted for her to stop and shot Lucille with his taser twice in the back. Lucille shouted that the officers "shot her baby," and attempted to crawl toward her wounded son, but was restrained by Pangelinan, Comfort and Ferguson. While Lucille was on the ground, her head was pulled back, she was hit in the face, kicked in the stomach, and kicked in the back.

Cecil, Lucille, Anthony and Alverta were subsequently arrested. Alverta, who allegedly interfered with the McKenzies' arrest, was placed on the ground, arrested, handcuffed and taken to the Milpitas police station. She was held for at least four hours before being released; charges were subsequently dismissed. Cecil and Lucille were taken to the Valley Medical Center [1] emergency room for clearance and citation; they later pled no contest to charges of

violating California Penal Code § 148. Mrs. McKenzie states that while being arrested, she was hit in the back of the head and slammed into the police car's hood. There is no evidence that the officers used any racial epithets or racially derogatory language during the incident.

## II. *The Taser*

A taser is a hand held immobilizing device, approximately nine inches long, that is used by the Milpitas Police Department to control uncooperative or dangerous subjects. The taser is operated by propelling two darts at a hostile subject. When the two darts from a single cartridge strike the subject, so long as both darts remain in contact with the subject's body and/or clothing, the officer can send an electrical charge through the wires. The officer can continue to send charges through the subject by depressing a button. Two cartridges can be fired without reloading.

The current generated by the taser causes involuntary muscular contractions in the subject, which in turn usually causes the subject to lose muscular control for a short period of time and to fall to the ground. Because the tased subject loses muscular control, an officer can establish control over an uncooperative or dangerous subject without the need to resort to mace, batons, or personal combat techniques. The literature states that it is "effective in subduing drug-crazed and mentally deranged individuals" and useful for prisoner control. Exhibit A attached to Declaration of James Raymond Berg in Support of Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment ("Berg Decl."). Tasers are especially useful for subduing subjects under the influence of phencyclidine (PCP), since they tend not to respond to more conventional police techniques. Defendants claim that no one has suffered permanent or long term injury as a result of the electrical current produced by a taser, but plaintiffs' expert is aware of at least two people who have died in California after being shot by a taser.

---

**1.** City policy requires that anyone shot with a taser dart by a police officer must be taken to

Valley Medical Center to have the darts removed and to receive medical clearance.

Declaration of Frank Saunders in Opposition to Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment, ¶ 9 ("Saunders Decl.").

According to the City policy in force in March 1988, a taser is only properly used when: (1) lethal force does not appear to be justifiable and/or necessary; and/or (2) attempts to subdue the suspect by conventional tactics of verbalization, firm grip control, pain compliance holds, control holds and/or self-defense techniques have been, or will likely be ineffective; and/or (3) there is a reasonable expectation that it will be unsafe for officers to approach to within contact range of the suspect. Declaration of Police Chief Frank Acosta in Support of Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment, ¶ 3 and Exhibit A. The custom and practice in the Milpitas Police Department is to allow its patrol officers to carry the unholstered taser, in hand, on patrol. Plaintiffs allege that this custom renders the officer one-handed for purposes of performing physical arrest techniques and therefore encourages use of the taser, since officer safety would not permit dropping the loaded weapon. Declaration of Edward Coyne in Opposition to Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment, ¶ 6(f) ("Coyne Decl."); Saunders Decl., ¶ 6:4–26.

City taser training includes distributing a copy of the City's taser policy and discussing it with the officers. The officers are also trained to take all tasered subjects to an emergency room for medical clearance and to have the taser darts removed. No Milpitas police officer may use a taser without first taking the taser training course and passing a written test. A refresher course is given to each officer every year.

Plaintiffs allege that the training course provides no guidance to officers on constitutional, moral, legal and ethical standards as to the use of the taser and is silent regarding when *not* to use the taser. The City's taser policy does not address arrest policy. Plaintiffs aver that the City's policy of allowing probationary officers who pass the two hour taser training course to use a taser at his discretion invites abuse of discretion. Plaintiffs also take issue with the materials used in the taser training course and with the trustworthiness of the written exam.[2] The training leaves Milpitas Police Officers unaware of the dangers associated with prolonged continuation of the taser current, and fosters the practice of administering the taser current continuously until the desired result is achieved. Coyne Decl., ¶ 3; Saunders Decl., ¶ 9. Other than the Los Angeles Police Department, Milpitas is the only police department in California which allows line officers, rather than supervisorial staff, to use the weapon. Saunders Decl., ¶ 9. Finally, plaintiffs state that the custom and practice of using the taser after voice commands and before use of physical

---

2. The majority of officers in the Milpitas Police Department received their taser training at one of a number of taser training courses conducted by Corporal James Berg of the Milpitas Police Department. Berg Decl., ¶ 8. During the trainings, Corporal Berg lectures and demonstrates the use of the taser, and allows trainees to test fire the weapon. *Id.* At the end of the training course, the trainees are required to pass a written examination designed by Corporal Berg. Plaintiffs complain that the written examination is designed to be passed, and that no officer who has taken the test has ever failed it. A review of several of the examination questions is illustrative of plaintiffs' point.

18. To test the TASER:
A) Point the TASER against your leg and fire.
B) Place the TASER against your partners [sic] leg and fire.

C) Unload the TASER, push safety to arm, fire and listen for sparks.
D) Insert your finger into cartridge opening and fire.

22. If a suspect is TASERED and submits to arrest:
A) The TASER wires should be kept attached to the suspect and TASER unit in case a re-Tase is necessary.
B) Regardless of the suspects [sic] attitude, its OK to re-Tase the suspect every few seconds just to let him know whos [sic] boss.
C) Detach cartridge from unit and give to suspect as a souvenir of the occasion.
D) You have no idea what to do.
Taser Test, attached as Exhibit G to Berg Decl.

arrest techniques such as wrist locks, mace or batons, is improper and condones the use of unconstitutionally excessive force. Coyne Decl., ¶ 3; Saunders Decl., ¶¶ 7, 8, 10.

Since plaintiffs were tased only after "charging a police officer," defendants state that the taser policy did not deprive plaintiffs of any constitutional rights. Absent the taser policy, the officers would have had to use physical force. Plaintiffs allege that the officers were acting in accord with the City's taser policy, and that the City's policy and failure to train inevitably resulted in the deprivation of their rights.·

## DISCUSSION

 In order to recover under § 1983, plaintiffs must show: (1) that the actions of the Milpitas police officers were taken under color of state law; (2) that the conduct caused a deprivation of plaintiffs' constitutional rights; and (3) that the conduct was the consequence of a City of Milpitas policy or custom. *Hammond v. County of Madera,* 859 F.2d 797, 801 (9th Cir.1988). Section 1983 creates no substantive rights, but only provides the means of enforcing federal rights that have been conferred elsewhere. *Graham v. Connor,* — U.S. —, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989). Plaintiffs, who allege that they were victims of excessive force and falsely arrested, must prove that this alleged con-

duct violated their substantive federal rights. *Hammond,* 859 F.2d at 801.

I. *The Use of Excessive Force and the City's Taser Policy*

 A. Deprivation of Plaintiffs' Rights: Theories of Liability

Plaintiffs concede defendants' conduct does not violate the Fifth[3] and Eighth[4] Amendments to the United States Constitution and that violation of those Amendments was not properly plead. Allegations regarding violation of plaintiffs' Fifth and Eighth Amendment rights are hereby stricken from the complaint.

 Plaintiffs' claims under the Fourteenth Amendment are likewise stricken from the complaint. Allegations of police use of excessive force prior to and in the course of an arrest implicate Fourth Amendment rights, not substantive due process rights. *Graham,* 109 S.Ct. at 1871 (where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment). It is also settled that allegations of false arrest implicate the Fourth Amendment right to freedom from unreasonable seizures. *See Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). After *Graham* and *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), excessive force and false arrest claims must be analyzed under the Fourth, rather than the Fourteenth, Amendment.[5]

---

**3.** The Due Process Clause of the Fifth Amendment concerns the activities and decisions of the federal government and its actors; the officers here in question were not federal officers. *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1979).

**4.** The Eighth Amendment only comes into play after a person has been convicted of a crime. *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979).

**5.** Plaintiffs request leave to amend their complaint pursuant to Fed.R.Civ.P. 15(a) to state a Fourth Amendment violation because counsel "inadvertently failed" to include the words "Fourth Amendment" in the jurisdictional allegations. Declaration of Jeannine M. Ushana in Support of Motion For Order Granting Leave to Amend Complaint, ¶ 3. The addition of the

Fourth Amendment ground will in no way alter the facts contained in the First Amended Complaint, and defendants are aware of the underlying facts. *Id.,* ¶ 5.

 Since the purpose of pleadings is to facilitate a proper decision on the merits, district courts are to freely grant leave to amend pursuant to Rule 15(a) when justice so requires. *Howey v. United States,* 481 F.2d 1187, 1190 (9th Cir. 1973). A motion for leave to amend should be considered in light of the following factors: undue delay, bad faith, futility of amendment and prejudice. *Hurn v. Retirement Fund,* 648 F.2d 1252, 1254–55 (9th Cir.1981).

 Defendants oppose plaintiffs' motion because the proposed amended pleading would be futile: even with the amendment, plaintiffs would not be able to state a claim under § 1983. The Supreme Court in *Graham,* a case alleging a

### B. Deprivation of Plaintiffs' Rights: The Fourth Amendment

To determine whether a pleading states a Fourth Amendment cause of action, the Court must determine whether there was a "seizure" in the Fourth Amendment sense, and whether that "seizure" was accomplished in an unreasonably dangerous or inappropriate manner. *Tennessee v. Garner*, 471 U.S. at 8, 105 S.Ct. at 1699; *see also Robins v. Harum*, 773 F.2d 1004, 1009–10 (9th Cir.1985). A "seizure" occurs when, by means of physical force or show of authority, officers have in some way restrained the liberty of a citizen. *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 1380–82, 103 L.Ed.2d 628 (1989); *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balance of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake. *Graham*, 109 S.Ct. at 1871 (citations omitted). The "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Id.* at 1872. The proper application of the "reasonableness" test requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he or she is actively resisting arrest or attempting to evade arrest by flight. *Id.; Tennessee v. Garner*, 471 U.S. at 8–9, 105 S.Ct. at 1699–1700 (the

question is whether the totality of the circumstances justifies a particular sort of seizure).

### C. "Reasonableness" of the City's Taser Policy

Defendants state that the City's taser policy is indisputably reasonable and constitutional. Defendants claim that the Ninth Circuit has held that the use of tasers is not *per se* unconstitutional, and that the alleged unconstitutional acts did not result from a municipal policy or custom.

#### 1. The Constitutionality of the Use of Tasers

Defendants rely on *Michenfelder v. Sumner*, 860 F.2d 328, 334–36 (9th Cir. 1988), for the proposition that tasers are not *per se* unconstitutional. *Michenfelder* was brought by a prisoner who argued that the use of tasers to enforce the Nevada State Prison's prisoner strip search policy was a violation of the Eighth Amendment. Michenfelder, who was incarcerated in the maximum security unit for Nevada's 40 most dangerous prisoners, was threatened with a taser because he violently resisted a strip search. The Ninth Circuit cautioned that its ruling that Michenfelder did not state a violation of his Eighth Amendment rights should not "be taken as a holding that the use of a device whose long-term effects are unknown, would never violate the Eighth Amendment, nor that research could not uncover the evidence of an adverse long-term effect that would call into question the use of tasers." [6] 860 F.2d at 336.

Defendants argue that although *Michenfelder* was decided under the Eighth Amendment, its holding should be controlling in this case which involves "free" citizens. In *Michenfelder*, tasers were used

---

§ 1983 violation, analyzed police use of excessive force as violative of the plaintiff's Fourth Amendment rights, and held that similar excessive force cases should be analyzed under the Fourth Amendment as well. Plaintiffs are granted leave to file a Second Amended Complaint in order to allege violation of plaintiffs' Fourth Amendment rights. References to the Fifth, Eighth and Fourteenth Amendments are to be stricken from the complaint.

**6.** It is apparent that the *Michenfelder* court had concerns about the long-term safety of the taser. 860 F.2d at 335 n. 4. It noted that the taser was outlawed in New York because of great concern about its impact on people with heart problems. *People v. Sullivan*, 116 A.D.2d 101, 500 N.Y.S.2d 644, 647 (1986). Georgia state prisons classify taser guns as constituting deadly force. *McCranie v. State*, 172 Ga.App. 188, 322 S.E.2d 360, 361 n. 1 (1984).

to further a legitimate state interest in maintaining prison security. Defendants argue that Milpitas' policy authorizes the use of tasers for a similar legitimate state interest: maintaining the personal safety of officers and others while conducting arrests and investigatory stops. The Court finds that there is clearly a distinction between threatening use of a taser to control a violent prisoner, and tasing a free citizen who does not cooperate with a police investigation.

The Court, however, need not reach the question of whether the use of a taser is a *per se* violation of the Fourth Amendment. Rather, the relevant inquiry in this § 1983 action is whether the City's taser policy foreseeably resulted in the deprivation of plaintiffs' constitutional rights.

### 2. *The City's Taser Policy*

Because the individual officers are not defendants in this action, plaintiffs may recover under § 1983 only if there is a direct causal link between the allegedly unconstitutional acts they complain of and a policy or custom established by the City or Chief Acosta. *Monell*, 436 U.S. at 690–91, 98 S.Ct. at 2035–36; *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989). Defendants can only be found liable under § 1983 if the City's policy regarding the use of tasers caused the violation of plaintiffs' Fourth Amendment rights.

Defendants argue that the City's taser policy is reasonable as a matter of law since Milpitas police officers are authorized to use tasers only when reasonably necessary to control a subject who could not be controlled by less intrusive methods and/or who posed a threat to officers, and because the officers receive training in the use of tasers. The reasonableness of the use of force (and of the City's taser policy pursuant to which the officers were acting) "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 109 S.Ct. at 1871; *see also McKenzie v. Lamb*, 738 F.2d 1005, 1011 (9th Cir.1984) (reasonableness of use of force should be analyzed in light of such factors as officer safety, motivation for arrest and extent of injury inflicted).

The question of whether excessive force was used under the circumstances is usually one for the jury. *McKenzie*, 738 F.2d at 1008. There is considerable factual controversy as to whether the officers' use of tasers was objectively reasonable under the circumstances when tested against the Fourth Amendment standard. The McKenzies have alleged a constitutional deprivation of their Fourth Amendment rights.

### D. Municipal Liability: The "Failure to Train" Theory

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 109 S.Ct. at 1204. According to defendants, the Milpitas taser policy is constitutional, and plaintiffs cannot show any training inadequacies which amount to a "deliberate indifference" for plaintiffs' rights. Defendants argue, in effect, that the City trained the officers as to how to follow the City's taser policy, so it simply cannot be held accountable for failure to train. The provision of training does not end the inquiry: a policy which is constitutional on its face may give rise to violations of constitutional rights. *Id.* A particular officer's inadequate training is not enough to subject a municipality to liability for failure to train, but rather municipal liability is predicated on a close causal link between the identified deficiency in training and plaintiffs' constitutional violation. *Id.* Plaintiffs herein must prove that their injuries would have been avoided had the officers been trained under a sufficient program. *Id.*

It may happen that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be

said to have been deliberately indifferent to the need." *City of Canton,* 109 S.Ct. at 1205 (footnote omitted); *see Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (the need to train officers in the constitutional limitations of the use of deadly force is "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights). Milpitas' policy includes: supplying tasers to officers with limited experience; allowing officers to carry tasers when making investigatory stops; not requiring officers to holster their tasers; allowing officers to resort to the use of tasers immediately after verbal warnings; and, inadequately training officers in the constitutional ramifications and health hazards of using tasers. The City's taser policy is absolutely silent on arrest policy. Plaintiffs must prove that the City failed to train its officers, and that there is a causal connection between this failure and violation of their constitutional rights. Although this is a heavy burden, plaintiffs are entitled to present their case to a jury.[7]

### II. *False Arrest*

■ The McKenzies and Alverta Bradford allege that they were falsely arrested without probable cause. Plaintiffs have failed to allege that their arrests were the result of an improper City policy regarding arrest procedures, since plaintiffs only challenge the City's taser policy. Plaintiffs do not dispute this fatal defect, but extensively cite from a factually similar § 1983 case in which plaintiffs prevailed against *individual* officers on their claims that they were battered in violation of their due process rights. *See Lewis v. Downs,* 774 F.2d 711 (6th Cir.1985). Because plaintiffs have failed to allege a municipal policy which caused their false arrest, plaintiffs' false arrest claims are dismissed. *See Hammond v. County of Madera,* 859 F.2d

797, 801 (9th Cir.1988) (identifying an offending policy is an essential element of plaintiffs' § 1983 claims).[8]

### III. *The Section 1981 Claims*

■ Plaintiffs allege that the City and Chief Acosta violated their constitutional rights under 42 U.S.C. § 1981. Section 1981 guarantees that no person shall be denied equal rights under the law on account of race. An essential element of a valid § 1981 action is that defendants must have acted with the *intent* to discriminate on the basis of race. *General Building Contractors Assoc., Inc. v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982); *Stones v. Los Angeles Community College District,* 796 F.2d 270, 272 (9th Cir.1986).

■ Defendants state that plaintiffs' § 1981 claims must be dismissed because plaintiffs fail to allege that defendants were motivated by racial animus, or, alternatively, that defendants are entitled to summary judgment because plaintiffs' own testimony negates any possible conclusion of racial animus. Plaintiffs, in deposition testimony, state that the officers did not use racially derogatory language or otherwise show racial bias in the course of the March 19, 1988 incident.

Plaintiffs counter that even though the officers were careful in their depositions not to mention race, the situation "indicates" a racial animus: The McKenzies are Black, the officers were scared of Lucille McKenzie and other female family members, and the officers "immediately resorted to the use of force in a situation whose objective context did not call for this force...." Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment at 25. Discovery is closed, and plaintiffs offer only conjecture in support of their

---

**7.** While plaintiffs have called into question the reasonableness of the City's taser policy, plaintiffs have not alleged that a City policy foreseeably gave rise to their alleged physical battery. Claims of police brutality not grounded in city policy cannot lie against a municipality. Because plaintiffs have failed to allege a municipal

policy which precipitated their battery, plaintiffs' battery claims are dismissed.

**8.** Because plaintiffs failed to allege that a City policy or custom caused their false arrests, the Court need not consider whether the officers had probable cause to affect the arrests.

claims that they were falsely arrested and subjected to excessive use of force based upon the impermissible criterion of race. *Stones*, 796 F.2d at 273. Because plaintiffs have failed to allege a racially discriminatory motive, or to present any evidence of defendants' intent to discriminate, plaintiffs' § 1981 claim fails.

### CONCLUSION

The Court grants in part and denies in part defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment. Defendants' motion as to the "excessive force" claims is denied; there remains a triable issue of fact as to whether the City's taser policy and practice caused a violation of plaintiffs' civil rights. Defendants' motion to dismiss the "false arrest" claims and the "battery" claims is granted because plaintiffs failed to allege municipal liability. Defendants' motion to dismiss the § 1981 claims is granted because plaintiffs failed to allege racial animus. Plaintiffs' Motion for Leave to Amend is granted.

IT IS SO ORDERED.